900 A.2d 820

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. ANTHONY DIFRISCO, DEFENDANT–APPELLANT.

Argued January 31, 2006—Decided July 5, 2006.

158

*Lawrence S. Lustberg,* Designated Counsel, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney; *Mr. Lustberg, Jean D. Barrett* and *Megan Lewis,* Designated Counsel, on the briefs).

*Kenneth P. Ply,* Assistant Prosecutor, argued the cause for respondent (*Paula T. Dow,* Essex County Prosecutor, attorney).

Justice ZAZZALI delivered the opinion of the Court.

In *Gregg v. Georgia,* the United States Supreme Court declared that "the penalty of death is different in kind from any other punishment imposed under our system of criminal justice." 428 *U.S.* 153, 188, 96 *S.Ct.* 2909, 2932, 49 *L.Ed.*2d 859, 883 (1976). In light of that simple and profound consideration, this Court has taken extreme care to ensure that no death sentence is imposed in an arbitrary and capricious manner. In this case, four separate members of the same Court over two terms found for different reasons that a sentence of death was not warranted. Nevertheless, today defendant is housed in a unit awaiting execution.

To satisfy *Gregg* and ensure that a death penalty is properly imposed, our Legislature enacted the current death penalty statute. Among other protections, that statute requires this Court to conduct, upon a capital defendant's request, a proportionality review to determine that a defendant's death sentence is not disproportionate to other death sentences. In structuring our proportionality review procedures, we created a bifurcated capital appellate review system in which we first considered arguments for why a death sentence should be overturned other than proportionality and, if those arguments were rejected, then conducted a proportionality review in a separate proceeding. In 1999, we abandoned that bifurcated process and consolidated the two reviews.

Our decision to separate the determination whether a death sentence was properly imposed into two separate proceedings has led to the unique question in this matter. In 1994, in a four-to-three decision, the Court affirmed defendant's death sentence on direct appeal. One year later, in a separate five-to-two vote, we affirmed defendant's sentence pursuant to our proportionality review. However, in that decision, one Justice, who had voted to affirm defendant's sentence in the first proceeding, voted in the second to overturn the sentence, concluding that it was disproportionate. Between the two proceedings, then, four members of the Court voted to overturn defendant's death sentence and impose a life sentence. After our decision to consolidate the two proceedings, defendant filed a petition for post-conviction relief, arguing that his death sentence should be vacated because, had the two proceedings been combined, a majority of the Court would have voted to overturn his death sentence and impose a life sentence.

In resolving that issue, we must determine whether a Justice's proportionality review determination is part of his or her penalty review vote or whether the two reviews, although now consolidated, are distinct. We conclude that the two votes must be combined because they are aspects of the same determination—whether a death sentence has been properly imposed. In light of

that conclusion and because we find that a combined vote of defendant's two reviews reveals that a majority of the Court voted against his death sentence, we vacate defendant's death sentence and remand to the trial court for imposition of a life sentence.

## I.

The facts of this matter are discussed in detail in this Court's four previous opinions. *See State v. DiFrisco (DiFrisco I)*, 118 *N.J.* 253, 255–60, 571 *A*.2d 914 (1990); *State v. DiFrisco (DiFrisco II)*, 137 *N.J.* 434, 449–51, 645 *A*.2d 734 (1994); *State v. DiFrisco (DiFrisco III)*, 142 *N.J.* 148, 157–59, 662 *A*.2d 442 (1995), *cert. denied*, 516 *U.S.* 1129, 116 *S.Ct.* 949, 133 *L.Ed*.2d 873 (1996); *State v. DiFrisco (DiFrisco IV)*, 174 *N.J.* 195, 203–16, 804 *A*.2d 507 (2002), *cert. denied*, 537 *U.S.* 1220, 123 *S.Ct.* 1323, 154 *L.Ed*.2d 1076 (2003). Thus, we recite briefly only those facts relevant to this appeal.

On August 12, 1986, defendant entered Jack's Pizzeria in Maplewood and shot the owner, Edward Potcher, five times at close range, mortally wounding him. Approximately one year later, the New York City police arrested defendant in an unrelated matter at which time he confessed to the killing, telling police that he had been hired to kill Potcher for $2,500. A grand jury subsequently indicted defendant for capital murder. The County Prosecutor then filed notice that he would seek to prove three aggravating factors to support a death sentence: "outrageously or wantonly vile" murder, *N.J.S.A.* 2C:11–3c(4)(c); murder for hire, *N.J.S.A.* 2C:11–3c(4)(d); and murder to escape the detection of another crime, *N.J.S.A.* 2C:11–3c(4)(f). Thereafter, defendant pled guilty to capital murder and, pursuant to *N.J.S.A.* 2C:11–3c(1), waived a jury for the penalty phase of his trial. At the penalty-phase proceeding, the judge sentenced defendant to death.

Defendant appealed his conviction and sentence and, in *DiFrisco I, supra,* the Court affirmed the conviction but reversed his death sentence, finding that the State had failed to introduce any independent proof of the murder for hire aggravating factor. 118

*N.J.* at 279–83, 571 *A.*2d 914. The Court then remanded the matter for a new penalty-phase proceeding. *Id.* at 283, 571 *A.*2d 914. On remand, the trial court resentenced defendant to death after a jury unanimously found one aggravating factor—that defendant had committed the murder for hire—and that the aggravating factor outweighed all mitigating factors.

Defendant again appealed his death sentence, and, in a four-to-three decision, this Court affirmed the sentence. *DiFrisco II, supra,* 137 *N.J.* at 508, 645 *A.*2d 734. In that decision, Chief Justice Wilentz and Justices Garibaldi, Pollock, and O'Hern voted to affirm the death sentence, *ibid.,* while Justices Handler, Clifford, and Stein dissented, voting to vacate the death sentence and impose a life sentence, *id.* at 534, 645 *A.*2d 734 (Handler, J., dissenting). One year later, the Court conducted its proportionality review of defendant's sentence and, by a vote of five-to-two, affirmed the sentence. *DiFrisco III, supra,* 142 *N.J.* at 159, 662 *A.*2d 442. Writing for the majority, Justice Garibaldi was joined by Chief Justice Wilentz and Justices Pollock, Stein, and Coleman—Justice Coleman having replaced Justice Clifford after Clifford's retirement from the Court. *Id.* at 210, 662 *A.*2d 442. Justice Handler again dissented. *Id.* at 212, 662 *A.*2d 442 (Handler, J., dissenting). Justice O'Hern, who had voted to affirm the sentence on direct appeal, this time dissented, determining that the death sentence was disproportionate "because offenders such as defendant ... usually receive life sentences." *Id.* at 246, 662 *A.*2d 442 (O'Hern, J., dissenting).[1]

---

[1] Proportionality review is intended to ensure consistency in the application of the death penalty:

Unlike direct review, proportionality review does not question whether an individual death sentence is justified by the facts and circumstances of the case or whether, in the abstract, the sentence imposed on a defendant is deserved on a moral level. On the contrary, its role is to place the sentence imposed for one terrible murder on a continuum of sentences imposed for other terrible murders to ensure that the defendant has not been singled out unfairly for capital punishment.

The following year, defendant filed a post-conviction relief (PCR) petition, arguing that he was denied effective assistance of counsel during the penalty phase of his trial. The PCR court denied that petition and we affirmed. *DiFrisco IV, supra,* 174 *N.J.* at 246, 804 *A.*2d 507. During the pendency of defendant's petition, this Court decided *In re Proportionality Review Project,* in which we held that the proportionality review of a capital sentence should be consolidated with a defendant's direct death penalty appeal. 161 *N.J.* 71, 97, 735 *A.*2d 528 (1999). In 2003, defendant filed a second PCR petition. The trial court denied that petition and this appeal ensued. Defendant also filed a writ of habeas corpus with the United States District Court for the District of New Jersey, which that court has held in abeyance pending exhaustion of defendant's state court appeals.

## II.

As an initial matter, we first consider the State's argument that defendant is procedurally barred from bringing this petition because of the five-year time limitation in *Rule* 3:22–12. That *Rule* provides:

(a) General Time Limitations. A petition to correct an illegal sentence may be filed at any time. No other petition shall be filed pursuant to this rule more than 5 years after rendition of the judgment or sentence sought to be attacked unless it alleges facts showing that the delay beyond said time was due to defendant's excusable neglect.

(b) Capital Causes; Petition. In cases in which the death penalty has been imposed, defendant's petition for post-conviction relief must be filed within thirty days of the denial of *certiorari* or other final action by the United States Supreme Court in respect of defendant's direct appeal.

[*R.* 3:22–12.]

Paragraph (b), addressing PCR petitions in capital causes, was added in 2002, Pressler, *Current N.J. Court Rules,* comment on *R.* 3:22–12 (2005), and this appeal is the first opportunity for the Court to consider what effect, if any, that amendment has on PCR

[*State v. Timmendequas,* 168 *N.J.* 20, 76, 773 *A.*2d 18 (2001) (Long, J., dissenting) (citations and internal quotation marks omitted).]

petitions in capital causes. We find that, for capital causes, the *Rule* is susceptible to at least two interpretations. Under one interpretation, capital causes would be governed exclusively by paragraph (b). Accordingly, the *Rule* would require capital defendants to file a PCR petition within "thirty days of the denial of *certiorari* or other final action by the United States Supreme Court in respect of defendant's direct appeal," *R.* 3:22–12. Capital defendants then could file subsequent PCR petitions unrestrained by the time limitations of paragraph (a).

However, paragraph (b) also could be read in conjunction with the time limitations provided in paragraph (a). Therefore, under paragraph (b), capital defendants would have thirty days from final court action to file their first PCR petition. Subsequent PCR petitions then would have to satisfy the time limitations provided in paragraph (a). That interpretation is supported by reference to *Rule* 2:9–3(a). That *Rule* was amended at the same time as *Rule* 3:22–12 and provides for a stay of a death sentence pending appellate review "during the pendency of a *first* petition for post-conviction relief that is filed within thirty days after the United States Supreme Court's disposition." *R.* 2:9–3(a)(2) (emphasis added). Further, common sense suggests that the addition of paragraph (b) could not have been intended to eviscerate the five-year time limitation of paragraph (a) for capital causes but instead was intended to refine that limitation. Accordingly, we find that the latter interpretation must govern and that paragraph (b) properly applies to a capital defendant's first PCR petition. We also refer the issue to the Trial Judges Committee on Capital Causes to draft appropriate language that conforms with our holding.

■ Turning to the present matter, because this is defendant's second PCR petition, the five-year time limitation in paragraph (a) governs this appeal. Pursuant to that limitation, the relevant time period for defendant to file his second PCR petition was five years from the date of his death sentence on February 5, 1993. *See State v. Goodwin,* 173 *N.J.* 583, 594, 803 *A.2d* 102 (2002) ("The

five-year period commences from the time of the conviction or the time of the sentencing, whichever the defendant is challenging."). Although defendant's petition would be barred under the five-year limitation because he filed it on August 1, 2003, which is more than ten years after the trial court's February 5, 1993, death sentence, defendant's petition is not barred if his failure to file it before the expiration of the time limit was due to excusable neglect or if barring his petition would result in an injustice under *Rule* 1:1–2.

This Court has held that "[t]he five-year time limit is not absolute," *State v. Milne,* 178 *N.J.* 486, 492, 842 *A.*2d 140 (2004), and *Rule* 3:22–12 specifically provides an exception for instances in which "the delay . . . was due to defendant's excusable neglect." We issued our decision in *In re Proportionality Review Project,* the decision on which defendant bases his current claim, in 1999. At that time, defendant's five-year statutory limitation period, having ended on February 5, 1998, had already expired. Thus, it was by then too late for defendant to meet the five-year deadline. Although the State argues that defendant could have amended his first PCR petition—which he filed in 1996, but which was still on review after *In re Proportionality Review Project* was decided— we accept defense counsel's candid statement at oral argument that he did not realize the full effect of that decision until after review of his first PCR petition was complete. Because we find counsel's explanation reasonable, we conclude that defendant's failure to file his petition within the five-year time limit qualifies as excusable neglect.

 Further, the time limitation in *Rule* 3:22–12 must be viewed in light of its dual purposes. As we explained in *State v. Mitchell,* 126 *N.J.* 565, 575, 601 *A.*2d 198 (1992), the first purpose is to ensure that the passage of time does not prejudice the State's retrial of a defendant:

> As time passes after conviction, the difficulties associated with a fair and accurate reassessment of the critical events multiply. Achieving "justice" years after the fact may be more an illusory temptation than a plausibly attainable goal when memories have dimmed, witnesses have died or disappeared, and evidence is lost or unattainable.

The issue raised by defendant in this appeal involving the arbitrariness of his sentence does not implicate those concerns because, if we were to accept defendant's argument, then we would vacate his death sentence and impose a life sentence. There is no risk that a ruling in defendant's favor would frustrate justice because there will not be a retrial of this matter.

The second purpose of the *Rule* is

to respect the need for achieving finality of judgments and to allay the uncertainty associated with an unlimited possibility of relitigation. The Rule therefore strongly encourages those believing they have grounds for post-conviction relief to bring their claims swiftly, and discourages them from sitting on their rights until it is too late for a court to render justice.

[*Id.* at 576, 601 *A.*2d 198.]

As noted, we do not view this matter as an instance in which defendant sat "on [his] rights until it [was] too late for a court to render justice." *Ibid.* Although finality is an essential consideration, the *Rule* specifically exempts excusable neglect, which we find here. Therefore, allowing defendant to bring his petition will not "render the Rule largely meaningless." *Ibid.* Moreover, this appeal is distinguishable from those cases in which the *Rule* properly has been found to bar a petition. *See, e.g., State v. Marshall,* 173 *N.J.* 343, 355, 801 *A.*2d 1142 (2002) (barring second PCR petition because issue was adequately raised in first PCR petition); *Mitchell, supra,* 126 *N.J.* at 577, 601 *A.*2d 198 (holding PCR petition properly barred because petitioner did not claim excusable neglect or that sentence was illegal); *State v. Dugan,* 289 *N.J.Super.* 15, 22, 672 *A.*2d 1240 (App.Div.) (holding that defendant's mistaken belief that time limit began after entry of amended judgments of conviction did not constitute excusable neglect), *certif. denied,* 145 *N.J.* 373, 678 *A.*2d 714 (1996).

█ Finally, barring defendant's petition would result in the type of injustice that *Rule* 1:1–2 is intended to prevent by permitting a court to relax or dispense with any rule "if adherence to it would result in an injustice." To be sure, that *Rule* "was not intended to vitiate the rules from which it permitted exceptional relief [and] we [must] avoid the gradual disintegration of our rules

... by requiring that each such grant be carefully considered." *Mitchell, supra,* 126 *N.J.* at 579, 601 *A.*2d 198. Accordingly, "in determining whether there has been an 'injustice' sufficient to relax the time limits," we "consider the extent and cause of the delay, the prejudice to the State, and the importance of the petitioner's claim." *State v. Afanador,* 151 *N.J.* 41, 52, 697 *A.*2d 529 (1997). Weighing those considerations, we find that this appeal involves minimal prejudice to the State because no retrial is necessary, whereas defendant's petition, challenging his death sentence, raises an issue of substantial importance. Therefore, to avoid an injustice, we will relax the time limitation in *Rule* 3:22–12 and allow defendant to bring this petition.

## III.

Defendant's primary argument is that his sentence is arbitrary and capricious under *Furman v. Georgia,* 408 *U.S.* 238, 92 *S.Ct.* 2726, 33 *L.Ed.*2d 346 (1972), and thus violates the federal and state constitutional prohibitions against cruel and unusual punishment. Specifically, defendant points out that the direct appeal and proportionality review phases of his sentence were conducted prior to this Court's decision in *In re Proportionality Review Project,* in which those two phases were consolidated. Defendant argues that when the votes of his two separate reviews are combined—as defendant contends would have been the case had his appeal been decided after *In re Proportionality Review Project*—a majority of the members of this Court voted to reverse his sentence. In that respect, defendant states that he faces death "by the mere happenstance of timing."

In response, the State contends that defendant's sentence is not arbitrary and capricious because defendant "had a full and fair review of his conviction and sentence on direct appeal." Further, this Court consolidated the direct appeal and proportionality review phases of capital sentencing to increase the efficiency of capital proceedings, not because of any perceived unfairness in having distinct review phases. The State also argues that there is

no legal basis for accepting defendant's contention that the dissenting votes of two separate opinions can be combined. The State maintains that such a holding would allow capital defendants to argue that dissents in separate proceedings, such as separate PCR proceedings, should be combined, thereby encouraging defendants to file multiple petitions in an attempt to cumulatively find four members of the Court to vote to overturn their sentences. At oral argument, the State also asserted that the arbitrary and capricious standard only applies to the determination whether a death sentence has been constitutionally imposed at the trial level and therefore does not properly apply to this case in which defendant claims that his sentence is unconstitutional because of the unique circumstances of his appellate review.

In the alternative, the State argues that a proper counting of the votes of the two proceedings reveals a four-to-four split, which would result in an affirmance of defendant's sentence. The State calculates the four-to-four split by reasoning that the four votes in favor of affirmance were Chief Justice Wilentz and Justices Pollock and Garibaldi, who voted to affirm the sentence in both cases; and Justice Coleman, who voted to affirm in the only case on which he sat. Conversely, the four dissenting Justices were Justice Handler, who voted to reverse in both cases; Justices Stein and O'Hern, who voted to reverse in only one of the cases; and Justice Clifford, who voted to reverse in the only case on which he sat.

### IV.

Defendant's arguments relate directly to our death penalty review structure. Accordingly, to resolve this appeal, we review that framework.

### A.

On direct appeal of capital cases this Court determines both whether a defendant's conviction and death sentence should be upheld. *See, e.g., State v. Marshall,* 123 *N.J.* 1, 208, 586 *A.*2d 85

(1991) ("We affirm defendant's convictions for murder and conspiracy to commit murder. We also affirm his sentence of death."). In the first stage of that review, sometimes referred to as the "conviction review," we consider arguments relating entirely to whether a defendant's conviction during the guilt phase of a capital murder trial should be overturned. That review encompasses arguments relating to matters up to and including the jury's determination that a defendant is guilty of the alleged crime. If a majority of the Court determines that a conviction should be overturned, then the proper disposition is to reverse the conviction and remand for a new trial. *See State v. Pennington,* 119 *N.J.* 547, 599, 575 *A.*2d 816 (1990) (reversing conviction for capital murder and remanding for new trial).

In the second part of our capital-appeal review, sometimes referred to as the "penalty review," we consider whether a defendant's death sentence imposed during the sentencing phase of a capital murder trial should be overturned. During the sentencing phase, the jury determines whether a defendant, already found guilty of capital murder, should be sentenced to a life term or to death. The jury is asked to determine whether there are aggravating and mitigating factors and then to weigh any factors found to determine whether a death sentence should be imposed. If the jury does impose the death sentence, a defendant can then challenge that sentence on many different grounds. For example, in Marshall, *supra,* the defendant argued that his death sentence was improperly imposed because he had ineffective assistance of counsel during the sentencing phase and because the prosecutor made improper statements during that phase. 123 *N.J.* at 152–70, 586 *A.*2d 85. If, in our penalty review, the Court finds an error in the sentencing phase, we can either remand for a new sentencing-phase proceeding or remand for the imposition of a life sentence. The Court's choice between those two options turns on the specific circumstances in each case. *Compare State v. Ramseur,* 106 *N.J.* 123, 331, 524 *A.*2d 188 (1987) (affirming murder conviction but reversing death sentence and imposing life

sentence), *with State v. Biegenwald,* 106 *N.J.* 13, 70–72, 524 *A.*2d 130 (1987) (affirming conviction but vacating death sentence and remanding for new sentencing trial).

A Justice's vote during the Court's conviction review is distinct from his or her vote in the penalty review. That is because a Justice might find that a capital defendant was properly convicted but that the defendant's death sentence was improperly imposed. For example, in Marshall, *supra,* one Justice voted to affirm the defendant's conviction but voted to reverse the imposition of the death penalty. 123 *N.J.* at 267, 586 *A.*2d 85. Ultimately, it is the majority vote as to each determination—conviction review and penalty review—that controls. Accordingly, a defendant's conviction and death sentence will be upheld even if three Justices vote to reverse the death sentence during the conviction review and a different three Justices vote to reverse during the penalty review. Stated differently, the conviction would be affirmed by a four-to-three vote, and the sentence also would be affirmed by a four-to-three vote.

### B.

Although the above discussion provides a general overview of our two reviews, the issue in this matter requires that we examine our penalty review more closely. The penalty review is different from the conviction review because, in the penalty review, we must ensure that the death sentence does not violate the Eighth Amendment's prohibition against "cruel and unusual punishments." *U.S. Const.* amend. VIII.

In the watershed case of *Furman, supra,* the United States Supreme Court held that it was cruel and unusual punishment to send a man to his death without a proper method for determining whether he deserved such a punishment. 408 *U.S.* at 239, 251, 255, 92 *S.Ct.* at 2727, 2732, 2735, 33 *L.Ed.*2d at 350, 356, 358. In his concurrence, Justice Brennan argued that "the very words 'cruel and unusual punishments' imply condemnation of the arbitrary infliction of severe punishments." *Id.* at 274, 92 *S.Ct.* at

2744, 33 *L.Ed.*2d at 369 (Brennan, J., concurring). That decision "invalidated every death penalty statute in the nation." *Ramseur, supra,* 106 *N.J.* at 183, 524 *A.*2d 188.

In response to *Furman,* the state legislatures in Georgia, Texas, and Florida enacted new death penalty statutes, and, four years after *Furman,* the Supreme Court reviewed those statutes in *Gregg, supra,* 428 *U.S.* 153, 96 *S.Ct.* 2909, 49 *L.Ed.*2d 859. The Court first resolved the question left open by *Furman* and held that "the punishment of death does not invariably violate the Constitution." *Id.* at 169, 96 *S.Ct.* at 2923, 49 *L.Ed.*2d at 872. However, the Court noted that "[b]ecause of the uniqueness of the death penalty, [it must] not be imposed under sentencing procedures that create[ ] a substantial risk that it [will] be inflicted in an arbitrary and capricious manner." *Id.* at 188, 96 *S.Ct.* at 2932, 49 *L.Ed.*2d at 883. The Gregg Court sustained the state death penalty statutes in question as providing the proper framework for imposing the death penalty. *Id.* at 207, 96 *S.Ct.* at 2941, 49 *L.Ed.*2d at 893. As we explained in *Ramseur, supra,*

> *Furman* suggested that to pass constitutional muster, a capital punishment statute must achieve two objectives: limit imposition of the penalty to what is assumed to be the small group for which it is appropriate, and ensure that the limited class selected for the penalty is chosen with rationality and consistency. Both requirements are aimed primarily at eliminating the arbitrary nature of capital proceedings in the past and their high risk of discrimination. Death penalty statutes enacted after *Furman* ... attempted to adhere to these principles. A key feature was bifurcation. In the first proceeding of the bifurcated system, those murderers potentially subject to the death penalty are identified by the defining provisions of each statute. This proceeding narrows the class to "death eligibles." In the second proceeding, the sentencing proceeding, the narrow class is further limited by the jury's application of statutory identifying factors.
>
> In [*Gregg* ], the Supreme Court declared the Georgia post-*Furman* death penalty statute constitutional. The bifurcated proceeding, the use in the sentencing proceeding of aggravating and mitigating factors, the instruction that the jury must find at least one aggravating factor beyond a reasonable doubt, and the provisions for appellate review were deemed to constitute sufficient guidance of the jury's discretion.
>
> [106 *N.J.* at 183–84, 524 *A.*2d 188.]

In light of *Gregg,* this Court in *Ramseur* upheld the New Jersey death penalty statute as constitutional under the Federal and

State Constitutions. *Id.* at 190, 524 *A.*2d 188. Like the statutes at issue in *Gregg,* the New Jersey statute, *N.J.S.A.* 2C:11–3, provides that murder is a crime in the first degree for which a court shall sentence a defendant to a term of thirty years to life, *N.J.S.A.* 2C:11–3b. However, on the finding of a "death trigger" under *N.J.S.A.* 2C:11–3c, a defendant is potentially subject to the death penalty, and the court must conduct a separate proceeding to determine the sentence, *N.J.S.A.* 2C:11–3c(1). In that proceeding, the State has the burden of proving beyond a reasonable doubt certain listed aggravating factors. *N.J.S.A.* 2C:11–3c(2)(a). The defendant then can present evidence to prove any mitigating factors, *ibid.,* and the jury must return a special verdict setting forth the existence or nonexistence of the aggravating and mitigating factors, *N.J.S.A.* 2C:11–3c(3). If the jury finds an aggravating factor, then the verdict also must state whether that factor outweighs any mitigating factors found. *Ibid.* If so, then the defendant is sentenced to death. *N.J.S.A.* 2C:11–3c(3)(a). If the aggravating factors do not outweigh the mitigating factors, if no aggravating factors are found, or if the jury is unable to reach a unanimous verdict, then the defendant receives a life sentence. *N.J.S.A.* 2C:11–3c(3)(b)–(c).

The death penalty statute also grants the defendant the right to appeal a death sentence directly to this Court. As part of that appeal, the statute requires that,

> [u]pon the request of the defendant, the Supreme Court shall also determine whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Proportionality review under this section shall be limited to a comparison of similar cases in which a sentence of death has been imposed. . . .
>
> [*N.J.S.A.* 2C:11–3e.]

As we explained in *State v. Loftin,* 157 *N.J.* 253, 266, 724 *A.*2d 129 (1999), "[p]roportionality review arose in response to [*Furman* ]" and was designed to protect against the arbitrary and capricious application of the death penalty.

> The Georgia statute [upheld in *Gregg* ] provided for direct appeal to the state supreme court which, among other things, was to conduct a proportionality review

to determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

States seeking to enact constitutional death penalty statutes followed the statute upheld in *Gregg* like a recipe, careful to include provisions for appellate proportionality review.

[*Id.* at 267, 724 *A.*2d 129 (citations and internal quotation marks omitted).]

"Six years [after *Gregg* ], however, in *Pulley v. Harris,* 465 *U.S.* 37, 104 *S.Ct.* 871, 79 *L.Ed.*2d 29 (1984), the United States Supreme Court held that proportionality review was not 'indispensable' to a constitutionally acceptable capital punishment statute." *Id.* at 267, 724 *A.*2d 129. Although nine states repealed their proportionality review statutes in light of *Pulley, id.* at 269, 724 *A.*2d 129, our Legislature simply amended the statute so that a proportionality review is conducted only upon request of a capital defendant, *N.J.S.A.* 2C:11–3e. In *Ramseur, supra,* we recognized the relative insignificance of that amendment, stating that "we assume that almost all defendants who are sentenced to death will request such review." 106 *N.J.* at 327, 524 *A.*2d 188. We also explained the importance of proportionality review in assuring that death sentences are lawfully imposed:

Proportionality review has a function entirely unique among the review proceedings in a capital proceeding. Proportionality review, in the context of a capital sentencing scheme, is not appellate review to ensure that the aggravating factors outweigh beyond a reasonable doubt all the mitigating factors, or to determine if the death sentence is disproportionate to the crime in violation of the ban against cruel and unusual punishment. That death is not disproportionate in the sense of being a cruel and unusual punishment is presumed by the nature of the review.

. . . .

The proportionality review provision in the Act *is an important procedural mechanism to safeguard against the arbitrary and capricious imposition of the death penalty.*

[*Id.* at 326–30, 524 *A.*2d 188 (emphasis added).]

In the years following *Gregg,* we struggled to develop a proper mechanism for conducting proportionality reviews. Because the general terms of the enabling statute provided no guidance, the Court had to decide, among other matters, how many capital cases to compare; which cases to compare; and what factors to consider in conducting the comparison. *See generally In re Proportionality Review Project, supra,* 161 *N.J.* 71, 735 *A.*2d 528 (reviewing

special master's findings for implementation in proportionality review). In *Ramseur*, we also determined that, because of our difficulty in developing the proportionality-review procedure, as well as concerns over conserving judicial resources, proportionality reviews would be conducted only if defendants were unsuccessful on all other legal arguments for overturning their convictions and death sentences. *Id.* at 96, 735 *A.*2d 528. Further, not only was proportionality review reached last, but we created a bifurcated process so that the review was conducted in an entirely different proceeding. *Ibid.* The two proceedings eventually were called our direct appeal review (which included both conviction review and penalty review) and our proportionality review. *Id.* at 96–97, 735 *A.*2d 528. However, in *In re Proportionality Review Project,* we determined that the justifications for bifurcated proceedings were no longer persuasive and consolidated the reviews, *id.* at 97, 735 *A.*2d 528, although the Court has retained the practice of conducting a proportionality review only after we have affirmed a defendant's conviction and rejected all other arguments for reversing the death sentence.

## V.

The unique situation in this appeal—in which three Justices voted to reverse defendant's death sentence in the penalty review and one additional Justice voted to reverse in the proportionality review—requires us to evaluate the relationship between direct appeal penalty reviews and proportionality reviews. We now conclude that, because both penalty review and proportionality review determine whether a death sentence has been properly imposed, the two reviews are not distinct but rather different aspects of the same consideration—whether there was error in the imposition of the death penalty. In other words, the determination that a death sentence is proportionate to other death sentences is a necessary part of a Justice's decision to affirm a death sentence in our overall penalty review scheme.

As stated, when we review capital cases on direct appeal, this Court determines both whether a defendant was properly convicted of capital murder (conviction review) and whether the defendant's death sentence was properly imposed (penalty review). In our penalty review, we determine whether there was legal error in imposing the death sentence, such as prosecutorial misconduct, and whether that sentence was imposed in an arbitrary and capricious manner. The determination that a defendant's death sentence is proportionate to other death sentences is part of the determination that the death sentence is not arbitrary and capricious. We recognized that principle in *Ramseur, supra,* when we stated that "proportionality review ... *is an important procedural mechanism to safeguard against the arbitrary and capricious imposition of the death penalty.*" 106 *N.J.* at 330, 524 *A.*2d 188 (emphasis added).

Treating the two reviews as distinct would also lead to absurd results. For example, a death sentence could be affirmed even if three Justices voted in the penalty-review phase to reverse a death sentence and three other Justices voted to reverse in the proportionality-review phase. Under that hypothetical, the death sentence would stand although six members of this Court believed that it was improperly imposed. Moreover, the fact that we will not conduct a proportionality review if a defendant's conviction or death sentence has been reversed on other grounds does not change our conclusion. This Court routinely does not reach issues when its disposition on other arguments has resolved the matter. *See, e.g., State v. Feaster,* 184 *N.J.* 235, 262 n. 11, 877 *A.*2d 229 (2005) (declining to consider defendant's Fifth Amendment argument after finding in favor of defendant on other grounds). But, once reached, there is no reason to treat proportionality review as different from any other legal argument raised to challenge a death penalty sentence. Further, the proportionality review enabling statute, *N.J.S.A.* 2C:11–3e, does not suggest that the two reviews should be treated as distinct. Rather, the statute simply requires the Court to conduct a proportionality review upon request of a capital defendant. *Ibid.*

Our conclusion that proportionality review is properly part of penalty review is reinforced by decisions from other state courts that conduct proportionality reviews of death sentences. Research does not disclose any case in which a court has considered proportionality review to be a distinct phase separate and apart from a court's penalty review. *See, e.g., State v. White,* 168 *Ariz.* 500, 815 *P.*2d 869, 884 (1991) (conducting proportionality review as part of direct appeal in context of penalty review); *Douglas v. State,* 878 *So.*2d 1246, 1262 (Fla.2004) (same); *Gissendaner v. State,* 272 *Ga.* 704, 532 *S.E.*2d 677, 690–91 (2000) (same); *State v. Pratt,* 125 *Idaho* 546, 873 *P.*2d 800, 823 (1993) (same); *State v. Williams,* 192 *Ill.*2d 548, 249 *Ill.Dec.* 563, 736 *N.E.*2d 1001, 1017 (2000) (same); *Soto v. Commonwealth,* 139 *S.W.*3d 827, 876 (Ky. 2004) (same); *State v. Weiland,* 505 *So.*2d 702, 707 (La.1987) (same); *Russell v. State,* 670 *So.*2d 816, 839 (Miss.1995) (same); *State v. Garcia,* 358 *N.C.* 382, 597 *S.E.*2d 724, 753–54 (2004) (same); *State v. Van Tran,* 864 *S.W.*2d 465, 482 (Tenn.1993) (same); *State v. Elmore,* 139 *Wash.*2d 250, 985 *P.*2d 289, 322 (1999). Those courts routinely consider proportionality reviews in the context of other arguments challenging a defendant's death sentence.

Our prior practice of conducting our capital review in bifurcated proceedings was an artificial construct intended to benefit this Court and parties by the avoidance of the lengthy and difficult process of proportionality review when doing so would be unnecessary to the ultimate disposition of a case. That construct does not change the fact that penalty review and proportionality review are part of the same legal inquiry—whether a death sentence was properly imposed. That is, proportionality review provides an additional protection against the arbitrary and capricious imposition of the death penalty. For those reasons, we reject the dissents' contention that proportionality review is distinct from penalty review, *post* at 180–81, 900 *A.*2d at 834 (LaVecchia, J., dissenting); *post* at 186, 900 *A.*2d at 837 (Rivera–Soto, J., dissenting) (same), and conclude that the determination that a death

sentence is proportionate to other death sentences is part of a Justice's decision to affirm a death sentence in our penalty review.

## VI.

In view of our conclusion that proportionality review and penalty review are not distinct, we hold that in the present matter defendant's death sentence must be vacated and a life sentence imposed. A review of the votes in the two appeals leads to the conclusion that our construct of conducting bifurcated proceedings prevented the Court from determining that defendant's death sentence was improperly imposed. In other words, defendant's death sentence was upheld only because our penalty review was separated into two proceedings, not because a majority of the Court believed that imposition of the death sentence was proper.

In *DiFrisco II, supra*, during our then-separate direct appeal review, Justices Clifford, Stein, and Handler concluded that

[b]ecause the trial court failed to ascertain whether the jury had reached a final non-unanimous life verdict, and because this Court has no ability to divine which of several potential explanations of what happened is accurate, its conclusion that a non-unanimous verdict was not lost is pure speculation. *Defendant's death sentence cannot be based on guess-work and must be reversed.*

[137 *N.J.* at 517–18, 645 *A.*2d 734 (Handler, J., dissenting) (emphasis added).]

As a remedy, the three Justices would have vacated the death sentence and remanded to the trial court for the imposition of a life sentence. *Id.* at 534, 645 *A.*2d 734 (Handler, J., dissenting).

Then, in this Court's proportionality review in *DiFrisco III, supra*, Justice O'Hern argued that defendant's death sentence should be reversed and a life sentence imposed, stating that "the sentence of death in this case is disproportionate because offenders such as defendant ... usually receive life sentences." 142 *N.J.* at 246, 662 *A.*2d 442 (O'Hern, J., dissenting). Accordingly, four Justices—and thus a majority—found that defendant's death sentence was improperly imposed and that he should receive a life sentence. Although those Justices reached their conclusions based on different reasoning, they agreed on the final result. *See Loper v. Beto*, 405 *U.S.* 473, 92 *S.Ct.* 1014, 31 *L.Ed.*2d 374 (1972)

(writing for four members of Court, Justice Stewart was joined by Justice White, who concurred in result based on different reasoning, to form five member majority). Further, the fact that the decisions were made one year apart is of no import. That was a function of our construct and cannot be dispositive in light of our analysis. We therefore vacate defendant's death sentence and, to effectuate the intent of the four Justices, remand to the trial court for imposition of a life sentence.

We add only that, in reaching our determination, we reject the State's claim that when the votes from the two reviews are consolidated they result in a four-to-four tie, and hence defendant's sentence should be affirmed. The State's argument mistakenly assumes that a decision of the Court could be determined based on the votes of eight Justices notwithstanding the fact that the New Jersey Constitution limits the Court's membership to seven. *N.J. Const.* art. VI, § 2, ¶ 1.[2]

## VII.

Accordingly, because proportionality review and penalty review both determine whether a death sentence was properly imposed, we hold that the two votes must be combined. In this matter, a combined vote reveals that a majority of this Court concluded that defendant should receive a life sentence. We therefore reverse the trial court's denial of defendant's petition for post-conviction relief, vacate defendant's death sentence, and remand to the trial court for imposition of a life sentence.

Chief Justice PORITZ and Justices LONG and ALBIN join in Justice ZAZZALI's opinion.

---

[2] Because of our resolution of this appeal, we need not discuss defendant's argument that his death sentence should be vacated based on this Court's decision in *State v. Fortin*, 178 *N.J.* 540, 843 *A.2d* 974 (2004).

Justice LaVECCHIA filed a separate, dissenting opinion in which Justices WALLACE and RIVERA–SOTO join.

Justice RIVERA–SOTO filed a separate, dissenting opinion, in which Justice WALLACE joins.

Justice LaVECCHIA, dissenting.

Defendant asserts the novel argument that votes taken in separate proceedings to review his capital conviction and sentence must be aggregated retrospectively. He contends that we should combine all negative votes cast on the issue of his capital sentence, whether a justice's vote was cast in the direct appeal of his capital sentence or, later, in a separate proceeding to review the proportionality of that already validated sentence. So viewed, defendant maintains that his sentence is "freakish" [1] because a combination of four justices of differently constituted membership of this Court have voted, over time and in different proceedings, not to uphold his death sentence. I find defendant's argument unpersuasive. Moreover, a majority of this Court can embrace it only by 1) pronouncing for the first time today that votes on penalty phase issues are to be combined with proportionality review votes because they are related, thereby altering the Court's prior approach and recordation of its voting in respect of capital sentences, and by 2) not respecting the finality of the Court's prior judgments. Accordingly, I respectfully must dissent.

## I.

Our system for capital conviction and sentence review involves several phases of proceedings: guilt-phase review, penalty-phase review, proportionality review, and thereafter a post-conviction relief proceeding or proceedings. Each helps to insure that a

---

[1] See *Gregg v. Georgia,* 428 *U.S.* 153, 195, 96 *S.Ct.* 2909, 2935, 49 *L.Ed.*2d 859, 887 (1976) (expressing concern that "death sentences ... not [be] imposed capriciously or in a freakish manner.").

defendant's capital conviction and sentence is not arbitrary or capricious.

Although direct appeals in capital matters are heard now by this Court in the same appellate proceeding in which we review a defendant's claim of sentence disproportionality, the two determinations are distinct. *See N.J.S.A.* 2C:11–3e (juxtapositioning mandatory nature of direct appeal for every judgment of conviction that results in death sentence against distinct proportionality review to be provided, on request, to defendant facing imposition of capital sentence). The majority recognizes, as it must, that the Court first considers defendant's claims of error in the guilt and in the penalty phases of defendant's trial proceedings. If we conclude that 1) there was no reversible error in the guilt-phase of the trial and that the verdict of guilt stands, and 2) the jury determination imposing the penalty of death is valid, then we address defendant's claim that his death sentence is disproportionate. *See In re Proportionality Review Project,* 161 *N.J.* 71, 96, 735 *A.*2d 528 (1999) (noting that "proportionality review [does] not occur if the defendant's direct appeal [is] successful." (quoting *State v. Loftin,* 157 *N.J.* 253, 316, 724 *A.*2d 129 (1999))).

Thus, proportionality review has as its logical predicate a judgment by this Court that there is an otherwise enforceable death sentence that requires review to assuage any proportionality concern. Indeed, we have stated plainly that the proportionality review of a death sentence is not the same as

> the review of any legal error in the imposition of the sentence but, rather, the review of the sentence itself. We seek to determine [w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
>
> [*In re Proportionality Review Project, supra,* 161 *N.J.* at 75–76, 735 *A.*2d 528.]

The Court's determination on proportionality review is separate from the Court's determination on the necessary predicate to that review—a capital sentence that otherwise would be implemented. It is as analytically distinct in the present combined appellate proceedings as it was when the two proceedings were conducted separately. Administrative convenience alone compelled the join-

ing of proportionality review with our consideration of the direct appeal. No constitutional consideration motivated the Court to alter its prior practice. That we now conduct proportionality review and hear direct appeal issues at the same time does not render the two determinations related. In my view, they are no more related than when the Court determines that defendant's guilt-phase proceeding was not flawed by an error found to exist in the jury's imposition of a capital sentence during the penalty proceeding. Consolidation cannot provide the reason for changing the Court's treatment of these two different determinations.

And, there certainly is no basis for aggregating votes of the formerly separate proceedings that resulted in final judgments, each of which had an affirmative vote of the then sitting justices upholding defendant's capital sentence. If the logic of the conclusion reached by the majority today were so self-evident, the original justices who participated in the two judgments surely would have realized it at the time of voting on defendant's proportionality review. They could have applied to the number of negative votes on proportionality review the number of negative votes cast earlier when the Court considered the alleged errors in defendant's penalty phase trial. The Court, at the time, apparently did not view the votes as related either. That the Court affirmed defendant's capital sentence reinforces the separateness of the records, the proceedings, and the judgments reached in each.

Indeed, the two judgments reflect different and serial determinations based on different records. A death sentence is " 'disproportionate if other defendants with characteristics similar to those of the defendant under review generally receive sentences other than death for committing factually-similar crimes in the same jurisdiction.' " *State v. Papasavvas,* 170 *N.J.* 462, 473, 790 *A.*2d 798 (2002) (quoting *State v. Martini,* 139 *N.J.* 3, 20, 651 *A.*2d 949 (1994)). To that end, "[t]he first step in proportionality review is to determine the universe of cases against which the defendant's case will be compared." *Ibid.* Using that universe of cases, the

Court conducts a "frequency analysis" to determine " 'whether there is a societal consensus that the defendant in the case before us is sufficiently culpable such that his sentence may be deemed not aberrational.' " *Id.* at 474, 790 *A.*2d 798 (quoting *State v. Chew,* 159 *N.J.* 183, 201, 731 *A.*2d 1070 (1999)). That frequency analysis entails assigning the defendant's case to a category, *i.e.* F–1 murder committed during a residential robbery, and then determining the percentage of F–1 defendants in the universe of cases who have received the death penalty. *Id.* at 474–76, 790 *A.*2d 798. That analysis is used to assess whether there is societal consensus for or against the use of the death penalty in F–1 cases. *Id.* at 476, 790 *A.*2d 798. Following frequency analysis the Court conducts "precedent-seeking review," wherein the Court "examine[s] death-eligible cases similar to defendant's case to determine whether his death sentence is aberrant when compared to the sentences received by defendants in those other cases," in order "to ensure that the defendant has not been singled out unfairly for capital punishment." *Id.* at 477, 790 *A.*2d 798 (internal quotations omitted). In undertaking a precedent-seeking review, we evaluate defendant's criminal culpability as compared to that of other similar defendants. *Chew, supra,* 159 *N.J.* at 210, 731 *A.*2d 1070. The Court considers the defendant's moral blameworthiness, the degree of victimization, and the defendant's character. *Papasavvas, supra,* 170 *N.J.* at 480, 790 *A.*2d 798. To aid in the comparison with other similar cases, those categories are refined further: a defendant's moral blameworthiness takes into consideration defendant's motive, premeditation, and justification or excuse. *Ibid.*

As is evident from the foregoing, the record used in frequency analysis and precedent-seeking review is comprised of data concerning other cases involving different defendants and that data constitutes information not contained in the record on direct appeal. The fact that each review results in a judgment as to the validity of defendant's death sentence does not make them part of the same proceeding, or render the determinations related so as to justify vote aggregation. Here the Court had two judgments

based on different records answering questions that are different from one another. The existence of a valid jury determination imposing a death sentence was a predicate to conducting proportionality review. And, the latter review analyzed a record containing material never presented to the guilt- or penalty-phase jury, including statistical analyses and comparisons of defendant's person and crime with case studies of other similar defendants and crimes, all gathered and prepared for the Court's review by a Special Master.

Plainly, I view the issues addressed on direct appeal and during proportionality review as unrelated. One justice's vote on the issues before the Court on direct appeal—in respect of both guilt and the validity of the capital sentence imposed as a result of the penalty phase of the trial—has no bearing on his or her vote cast in the determination of the unique questions posed by proportionality review. It is entirely possible for members of this Court to vote differently in the two phases and, in fact, they did. However, it is the majority vote as to each proceeding that must control in these serial reviews, not the identity of the voting members. If it were otherwise, the Court should have long ago started to aggregate the voting records of justices on issues concerning the guilt phase, or the penalty phase of a defendant's trial, with the votes cast on claims of ineffective assistance of counsel performed after post-conviction review.[2] The result would be the same in that

---

[2] The following hypothetical reveals the flaw in the majority's analysis. Assume that this Court consists of Justices A, B, C, D, E, F, and G. On direct appeal, a defendant argues that his conviction should be overturned because critical evidence should have been excluded. In a four-to-three vote, this Court rejects the defendant's argument. Justices A, B, C, and D vote to affirm the defendant's conviction. Justices E, F, and G dissent. The Court's judgment affirms the defendant's conviction. On post-conviction review, the defendant argues that his conviction should be overturned because he received ineffective assistance of counsel during the guilt phase of trial. In a four-to-three vote, this Court rejects the defendant's argument and the Court's judgment affirms the defendant's conviction. Justices A, B, C, and G vote to affirm defendant's conviction. Justices D, E, and F dissent. Under the majority's approach, the defendant's conviction must now be overturned because four justices (D, E, F,

perhaps a new majority of voting justices might find reason to fault the conduct of the guilt or penalty trial and either reverse a sentence, or a conviction. That is not justice. That is disruption of the finality of judgments.

## II.

Because I cannot justify the reversal of validly entered judgments of this Court, I respectfully dissent.

Justice WALLACE and Justice RIVERA–SOTO join in this opinion.

Justice RIVERA–SOTO, dissenting.

I concur wholly in Justice LaVecchia's thoughtful and clear dissent. I add only the following.

For the fifth time, this Court reviews the death sentence originally imposed on defendant Anthony DiFrisco in 1988 and then re-imposed on remand in 1992 [1] for the for-hire murder of an alleged informant: *State v. DiFrisco (I)*, 118 *N.J.* 253, 571 *A.*2d 914 (1990) (affirming defendant's conviction but reversing the imposition of the death sentence); *State v. DiFrisco (II)*, 137 *N.J.* 434, 645 *A.*2d 734 (1994) (affirming defendant's conviction and death sentence); *State v. DiFrisco (III)*, 142 *N.J.* 148, 662 *A.*2d 442 (1995), *cert. denied*, 516 *U.S.* 1129, 116 *S.Ct.* 949, 133 *L.Ed.*2d 873 (1996) (affirming defendant's death sentence on proportionality review); and *State v. DiFrisco (IV)*, 174 *N.J.* 195, 804 *A.*2d 507

and G) voted to overturn the defendant's conviction. The fact that the defendant's conviction was reviewed in two separate proceedings would be of no consequence to the majority.

[1] Defendant pled guilty to capital murder and an underlying weapons offense; defendant waived a jury for the penalty phase and the trial court imposed the death sentence. On remand, defendant sought to withdraw his plea; that request was denied. Defendant sought a jury for his penalty phase and ultimately was sentenced to death by the jury.

(2002) (affirming denial of defendant's petition for post-conviction relief).

Pivoting off of this Court's later consolidation of direct appeals and proportionality reviews in capital cases, *In re Proportionality Review Project (I)*, 161 *N.J.* 71, 735 *A.2d* 528 (1999), the majority embraces a new theory to speculate that, had defendant's direct appeal and proportionality review been consolidated, his death sentence would not have been affirmed. Emphasizing "[t]he unique situation in this appeal[,]" *ante*, 187 *N.J.* 175, 900 *A.2d* 831 (2006), the majority concludes that "because penalty review and proportionality review determine whether a death sentence has been properly imposed, the two reviews are not distinct[,]" and that, therefore, "the determination that a death sentence is proportionate to other death sentences is a necessary part of a Justice's decision to affirm a death sentence in our penalty review." *Ante*, 187 *N.J.* 175, 900 *A.2d* 831 (2006). According to the majority, "[o]ur prior practice of conducting our capital review in bifurcated proceedings was an *artificial* construct[.]" *Ante*, 187 *N.J.* 177, 900 *A.2d* 832 (2006) (emphasis supplied). No matter how it is presented, an inescapable fact remains: the majority's conclusion is grounded in the aggregate of *dissenting* votes in *State v. DiFrisco (II)* and *State v. DiFrisco (III)* that, at best, total four votes to reverse, matching four votes to affirm. That conclusion, and its effect, is contrary to our settled law that appeals lie from judgments and not from the views of individual judges.

Placing aside the timeliness of defendant's now second application for post-conviction relief,[2] the majority, in order to reach the conclusion it desires, impeaches two earlier and admittedly correct

---

[2] The State asserts that defendant's second petition for post-conviction relief should be barred as untimely. The majority expends great effort in rejecting that view. *Ante*, 187 *N.J.* 164–66, 900 *A.2d* 824–25 (2006). Regardless of the State's view that this application is procedurally barred, it is the substance of the majority's holding that is most deserving of condemnation. It is there that our focus must and does lie.

decisions of this Court. Thus, under the new rule today announced by the majority—one the majority impliedly prays is applicable to only this case and no other—not only do two rights make a wrong, but litigants are now encouraged to engage in the entirely unseemly head-counting of individual justices in different appeals in a quest to cobble together an aggregate majority. That process is anathema to our system of jurisprudence and cannot be countenanced. Therefore, I dissent.

## I.

The principal vice in the majority's analysis lies in its jettisoning of two of its earlier valid judgments without a reasoned basis for so doing. We have twice considered, and affirmed, defendant's death sentence. *State v. DiFrisco (II)*, 137 *N.J.* 434, 645 *A.*2d 734 (1994); *State v. DiFrisco (IV)*, 174 *N.J.* 195, 804 *A.*2d 507 (2002). Under bedrock principles of our jurisprudence, those decisions should not be subject to the majority's unwarranted and novel attack. In both *State v. DiFrisco (II)* and *State v. DiFrisco (IV)*, this Court examined and rejected, first on direct appeal and yet again on post-conviction relief, defendant's challenges to his death sentence. *Compare, State v. DiFrisco (II), supra, with, State v. DiFrisco (IV), supra.*

Disregarding that precedent, the majority now asserts that "[o]ur prior practice of conducting our capital review in bifurcated proceedings was an *artificial* construct...." *Ante,* 187 *N.J.* 177, 900 *A.*2d 832 (2006) (emphasis supplied). Having diminished this Court's earlier precedent, the majority then declares, without the benefit of any authority and contradicted by the very case in which it seeks to declare a new rule of law, that "the determination that a death sentence is proportionate to other death sentences is part of a Justice's decision to affirm a death sentence in our penalty review." *Ante,* 187 *N.J.* 177, 900 *A.*2d 832 (2006). That conclusion is the unsustainable result of the majority's new arithmetic jurisprudential rule that counts the votes of some of the

Justices, while disregarding the contrary votes and prevailing votes of others. It is to that new rule that I now turn.

## II.

In the pursuit of voiding a now eighteen-year-old death penalty, today the majority creates new and unprecedented law. The majority makes much of its numerical analysis contrasting defendant's direct appeal with the proportionality review of his sentence. According to the majority,

> In *DiFrisco II, supra,* during our then-separate direct appeal review, Justices Clifford, Stein, and Handler concluded that
>
>> [b]ecause the trial court failed to ascertain whether the jury had reached a final non-unanimous life verdict, and because this Court has no ability to divine which of several potential explanations of what happened is accurate, its conclusion that a non-unanimous verdict was not lost is pure speculation. *Defendant's death sentence cannot be based on guess-work and must be reversed.*
>
> [137 *N.J.* at 518 [645 *A.2d* 734] (Handler, J., dissenting) (emphasis added).]
>
> As a remedy, the three Justices would have vacated the death sentence and remanded to the trial court for the imposition of a life sentence. *Id.* at 534 [645 *A.2d* 734] (Handler, J., dissenting).
>
> Then, in this Court's proportionality review in *DiFrisco III, supra,* Justice O'Hern argued that defendant's death sentence should be reversed and a life sentence imposed, stating that "the sentence of death in this case is disproportionate because offenders such as defendant . . . usually receive life sentences." 142 *N.J.* at 246 [662 *A.2d* 442] (O'Hern, J., dissenting). Accordingly, four Justices—and thus a majority—found that defendant's death sentence was improperly imposed and that he should receive a life sentence. Although those Justices reached their conclusions based on different reasoning, they agreed on the final result. . . . As such, we must vacate defendant's death sentence and, to effectuate the intent of the four Justices, remand to the trial court for imposition of a life sentence.
>
> [*Ante,* 187 *N.J.* 178–79, 900 *A.2d* 833 (2006) (citations omitted).]

However, the error of engaging in the highly unusual head-counting embraced by the majority is highlighted upon close examination. The majority completely ignores that Justice Stein first voted to reverse defendant's murder conviction but later held that the imposition of the death penalty was proportionate under the circumstances. Rather, the majority only considered that Justice O'Hern concluded the opposite. Entirely lost in the majority's analysis is that, in the interim, Justice Coleman re-

placed Justice Clifford and voted that defendant's sentence was proportionate. If the majority's construct has any currency, at best, then, an aggregate of four Justices found fault with either defendant's conviction *or* sentence, but four Justices sustained defendant's conviction *and* sentence. Using basic arithmetic, that results in a 4–4 tie that would have affirmed defendant's conviction and sentence. I do not embrace this arithmetic analysis, but present it solely to unveil the weakness at the core of the majority's reasoning.

We cannot and should not give Justice O'Hern's purported change of heart any greater weight than we give to Justice Stein's divergent votes. The only principled basis for analysis here is that the determination of whether a death sentence is to be imposed is quite different from the determination whether, once imposed, that penalty is disproportionate. Justices O'Hern and Stein correctly recognized that difference then and Justice La-Vecchia pointedly underscores it now. Yet, it is one the majority simply ignores.

There simply is nothing to indicate that, in this case, a different result would have obtained had the Court consolidated defendant's direct appeal with his request for a proportionality review of his death sentence. What is inescapable is that, when it rejected defendant's attacks on his death sentence, either as a matter of direct appellate review or in proportion to "similar cases in which a sentence of death has been imposed," *N.J.S.A.* 2C:11–3(e), this Court, by a majority vote of its members, affirmed defendant's death sentence. We have been presented no principled reason to disturb those judgments.

At its core, then, I reject the majority's analysis for the reasons eloquently and succinctly stated by Justice Blackmun:

> Although personally I may rejoice at the Court's result, I find it difficult to accept or to justify as a matter of history, of law, or of constitutional pronouncement. I fear the Court has overstepped. It has sought and has achieved an end.
>
> [*Furman v. Georgia*, 408 *U.S.* 238, 414, 92 *S.Ct.* 2726, 2816, 33 *L.Ed.*2d 346, 450–51 (1972) (Blackmun, J., dissenting).]

Justice WALLACE joins in this opinion.

*For reversal/vacation/remandment*—Chief Justice PORITZ and Justices LONG, ZAZZALI and ALBIN—4.

*For Dissent*—Justices LaVECCHIA, WALLACE and RIVERA–SOTO—3