NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1069-20

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

PAK L. CHAU, a/k/a
XAVIER P. CHAU,

     Defendant-Appellant.

_____

> APPROVED FOR PUBLICATION
>
> September 7, 2022
>
> APPELLATE DIVISION

Argued November 29, 2021 – Decided September 7, 2022

Before Judges Messano,[1] Accurso and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment Nos. 11-01-0223 and 12-09-2133.

Ronald P. Mondello argued the cause for appellant.

John J. Santoliquido, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Cary Shill, Acting Atlantic County Prosecutor, attorney; John J. Santoliquido, of counsel and on the brief).

---

[1] Judge Messano did not participate in oral argument. He joins the opinion with counsel's consent. R. 2:13-2(b).

The opinion of the court was delivered by

ACCURSO, J.A.D.

Defendant Pak L. Chau appeals from an order dismissing his petition for post-conviction relief (PCR) as time-barred and denying his Slater[2] motion premised on alleged ineffective assistance in connection with two guilty pleas he entered nearly ten years ago.  We reverse and remand for an evidentiary hearing.

Having reviewed the record, we are satisfied defendant established excusable neglect for failing to file a timely PCR petition in accordance with State v. DiFrisco, 187 N.J. 156, 166 (2006), as his Texas immigration counsel, who has represented defendant since shortly after he was placed in U.S. Department of Homeland Security, Immigration and Customs Enforcement (ICE) detention in 2014, certified he failed to advise defendant until September 2019 of the availability of a PCR application in New Jersey.  Defendant obtained New Jersey counsel the same month, who filed this application on his behalf.

We are also convinced there is a reasonable probability that if defendant's factual assertions that he pleaded guilty to receiving stolen property, not because he was guilty but because he got erroneous advice about

---

[2]  State v. Slater, 198 N.J. 145, 157 (2009).

A-1069-20

the immigration consequences of risking trial and a jail term, are found to be true, "enforcement of the time bar would result in a fundamental injustice." R. 3:22-12(a)(1)(A). The court is also to reconsider defendant's Slater motion on remand, as defendant's testimony in support of his ineffective assistance claim may inform the court's assessment of defendant's colorable claim of innocence and the strength of his reasons for wishing to withdraw his plea, the first two factors in a Slater analysis. See State v. O'Donnell, 435 N.J. Super. 351, 370-71 (App. Div. 2014).

Because the trial court rendered its decision without an evidentiary hearing, our review of both its legal and factual determinations is de novo. State v. Harris, 181 N.J. 391, 421 (2004); State v. Aburoumi, 464 N.J. Super. 326, 338-39 (App. Div. 2020). As directed by our Supreme Court, we "view the facts in the light most favorable to the defendant." State v. Jones, 219 N.J. 298, 311 (2014).

Defendant came to this country as a lawful permanent resident in 2005 with his mother and sisters. He was fifteen years old. His father remained behind in Hong Kong to manage the family's business. In August 2010, he was charged with fourth-degree shoplifting from a ShopRite in Galloway

A-1069-20

Township.[3] Two months later, he was again charged with shoplifting, this time in the third degree, from a ShopRite in Galloway Township. He was admitted into the pre-trial intervention (PTI) program in 2011.

A year later, defendant was charged with third-degree receiving stolen property, specifically a 1993 Mazda Miata. Defendant was arrested after he contacted police following a call from his mother that police wanted to speak to him about the Miata. He told police he was selling a 1990 Miata and parts on Craigs List. "[S]ome guy" who'd apparently seen defendant's listing contacted him online to ask him if he were interested in buying a 1993 Miata special edition. Defendant purchased the Miata for $3,000, consisting of $500 in cash and a supercharger valued at $2,500. "The guy" told defendant he would mail him the title, or he could get one from the Division of Motor Vehicles for $200. Defendant told police he put the tags from his 1990 Miata on the car until he could get the new title. Police tracked him through his old tags.

As defendant was leaving the stationhouse, he heard a man in the lobby talking on the phone to dispatch about the stolen Miata and asked if he was the owner. Defendant apologized about the incident and told the owner he'd

---

[3] Defendant had already been convicted of the disorderly persons offense of shoplifting in municipal court in Absecon in 2009.

4

bought the car from a guy on Craig's List. He also offered to try to reimburse the owner for the storage fees the police were charging him to store the car. The only information he could offer about the seller was that he was "a Spanish guy." The owner told police he'd fired a new employee of his business the week before; an Hispanic man, who the owner claimed was a recovering heroin addict. The Miata was stolen from the parking lot of the owner's business.

Defendant, represented by the same public defender who had gotten him into PTI, pleaded guilty to receiving stolen property in November 2012, even though, as the judge taking his plea informed him, "this guilty plea to this new charge will really almost certainly terminate your PTI unsuccessfully."[4] On learning defendant was not a citizen, the judge also ensured defendant was aware that if a federal immigration judge concluded the charge to which defendant was pleading guilty "is what they call an aggravated felony," he "would certainly be deported" and understood the judge could not tell him "with any certainty at all what the federal authorities will or will not do with respect to your immigration status because of this guilty plea."

---

[4] Defendant had two weeks earlier entered a not-guilty plea and his counsel had asked for a status conference in two weeks, saying the defense had "discovery and an offer from the State." Defendant pleaded guilty at the status conference with a "[r]ecommended sentence by the State [of] probation with no jail time."

A-1069-20

Defendant declined the judge's invitation to postpone his plea in order to consult with immigration counsel and told the judge he understood the charge and the rights he was waiving by entering a guilty plea. When the judge asked if defendant intended to plead guilty after being provided all that information, defendant responded, "Well, I don't have a choice, so." When the judge advised defendant he did "have a choice," defendant replied he "[didn't] want to risk going to jail, so." Defendant thereafter answered yes to the three questions put to him by his lawyer — was he in Atlantic City on May 15, 2012; did he have property in his possession, which he knew or believed was stolen; and was that property a 1993 Mazda Miata — and the judge accepted his plea to third-degree receiving stolen property.

Two months later, in January 2013, the same public defender who had represented defendant throughout the proceedings advised the court defendant would not oppose the State's motion to terminate PTI and wished to plead guilty to the third-degree shoplifting charge with the State's recommendation of probation with no jail time concurrent to his anticipated sentence for receiving stolen property. When the judge asked defendant in the course of the plea colloquy if he understood his plea could have "immigration consequences," the two engaged in the following exchange.

A. Yes. I talked to a lawyer.

A-1069-20

Q. Oh, you did?

A. Yeah, I talked to a lawyer already.

Q. To an immigration lawyer?

A. Well, they won't — as long as I stay out of jail and then I'll be fine. That's what he told me.

Q. Who was the lawyer you spoke to?

A. Well, I talked to the guy in Atlantic City.

Q. Yeah.

A. Yeah.

Q. Well, do you understand that if a federal immigration court concluded that these State charges that you've pled guilty to are what they call aggravated felonies, then you would be deported?

A. Yeah.

Q. And do you — do you understand that I can't tell you — I'm not empowered to tell you with any certainty at all what the federal authorities will or will not do because of these guilty pleas?

A. Yes.

Q. Do you have any desire to postpone the entry of this plea today so that you can consult further with an attorney who specializes in —

A. No.

Q. — immigration law?

A. No, that's my decision now.

7

A-1069-20

Q. I'm sorry?

A. That's my decision right now.

Q. That's your position.

A. That's my decision.

Q. That's your decision right now?

A. Yeah.

Q. Okay. You don't feel that you need the time to consult further with somebody in more detail?

A. No.

In his certification accompanying his verified petition, defendant avers he didn't "have any money" when he "got into trouble" and thus couldn't afford "a paid immigration consultation." He certified he called "all the numbers" he could find for immigration attorneys, until he "found one who gave [him] a free consultation over the phone," who told him he "would not be deported for these relatively minor offenses without any jail." Defendant averred he would never have pleaded guilty if he understood he was pleading to offenses that would make him deportable. He would have instead asked his public defender to try and gain his re-admittance to PTI or asked her "to try and obtain a non-deportable plea bargain." Defendant averred he would have rather "taken [his] chances at a trial knowing that [he] may have been sent to jail rather than plead guilty to crimes that [made him] deportable."

8

The judge accepted defendant's guilty plea to third-degree shoplifting and proceeded to sentencing. Asked if he wanted to speak on his own behalf, defendant declined, saying only that he "apologize[d] for what I did before, and it won't happen again." Noting defendant was twenty-two years old with one disorderly conviction, the judge found aggravating factor nine, the need to deter, and mitigating factor ten, that defendant is amenable to probation. Finding the aggravating and mitigating factors in equipoise, the judge sentenced defendant to three years' probation on both third-degree convictions to run concurrently. The judge advised defendant of his appeal rights and that he had five years in which to file a petition for PCR "on either one or both of these convictions." Observing that it appeared defendant had "got a lot of things going for [him]," the judge said he was "not getting where these offenses sprung up," but hoped defendant could maintain his resolve to stay out of a courtroom and wished him the best.

Shortly after his sentencing, defendant got an offer from a friend for a job in Dallas. Defendant accepted the job and moved there, transferring his probation to Texas. His longtime girlfriend followed him six months later. Defendant reports he was happy and working hard, meeting all the requirements of his probation and feeling he'd gotten his life back on track. His guilty pleas to the shoplifting and receiving stolen property charges,

9

however, constituted convictions to two crimes of moral turpitude not arising out of a single occurrence, rendering him deportable under section 237(a)(2)(A)(ii) of the Immigration and Nationality Act. See 8 U.S.C. § 1227(a)(2)(A)(ii). Defendant was taken into ICE custody in December 2014, nearly two years after his plea to third-degree shoplifting.

Defendant hired an immigration attorney in Texas, Vinesh Patel, shortly after being detained. In a certification submitted in support of defendant's petition, Patel explained he was able to secure the government's agreement to exercise prosecutorial discretion to terminate defendant's deportation proceedings in November 2015, arguing defendant had been rehabilitated and was eligible to "readjust status" via his marriage to his long-time girlfriend, a United States citizen, while he was in ICE custody. Patel certified he advised defendant in 2015 "he eventually could naturalize without fear of being removed." Defendant certified Patel "thought that if we just waited out this [then-]current presidential administration's immigration policy that [he] could become a USC," a United States citizen.

Patel averred he "later learned that this readjustment of status was simply not possible" for defendant. Further, Patel certified that in June 2018, the federal government issued a memorandum instructing United States Citizenship and Immigration Services officials "to place in deportation

A-1069-20

proceedings applicants who are denied naturalization, so long as they are removeable in theory for any offense, however minor." Patel claimed this was a change in policy, as previously "the Department of Homeland Security would not place applicants for naturalization in removal proceedings unless they presented egregious public safety threats." Patel averred defendant thus became subject to removal again with the June 2018 policy change and remains so without the vacatur of his two New Jersey convictions. Patel further averred that despite his having represented defendant since shortly after his arrest by ICE, he did not advise defendant until September 2019 about the availability of PCR "to solve his deportation problem."

Following that advice, defendant immediately hired his current New Jersey counsel, who filed this petition three months later. The trial court, after reviewing the petition and defendant's certification, his wife's and Patel's, from which these facts have been taken, as well as the parties' briefs and after hearing oral argument, denied the petition as time barred. Although noting the pleas were "a little bit out of order" because defendant's guilty plea to the receiving stolen property charge made him "in violation of PTI" by operation of law, the PCR judge found the judge who took defendant's pleas and sentenced him to probation made him aware of the deportation consequences of the pleas and, while "the case law says that what the judge says to the

11

petitioner doesn't substitute for immigration advice," see State v. Blake, 444 N.J. Super. 285, 297 (App. Div. 2016), defendant "affirmatively represented to [the judge] that he had immigration advice."

The PCR judge found no excusable neglect in defendant "finally [getting] an immigration attorney," who allegedly told him "not to pursue naturalization until after the [then-]current presidential administration concludes." Noting defendant allegedly got that advice in March 2016, although the then-current administration did not take office until January 2017, the judge found that not "competent evidence."[5] The judge also found no fundamental injustice because there was no pending removal proceeding and the immigration advice given, or not given, did not have "anything to do with a determination" of defendant's guilt "as to these two offenses." The judge found defendant "allocuted. He stated what needed to be stated, and he was found guilty." Because the judge found defendant failed to satisfy the standards for relaxing the time restriction for a first petition pursuant to Rule 3:22-12(a)(1)(A), she determined she was without jurisdiction to

---

[5] Defendant's PCR counsel admits that finding of the court was based on his error in his brief in the trial court, and that "defendant never said this." Counsel represents the date should have been March 2017. We note there is no date attributed to the advice in defendant's certification.

A-1069-20

consider the merits of defendant's petition.  See State v. Brown, 455 N.J.

Super. 460, 470 (App. Div. 2018).

The court further found defendant could not succeed on his application

to withdraw his plea, because none of the Slater factors could be found in his

favor.[6]  The court found defendant had not asserted a colorable claim of

innocence, and his reason for wishing to withdraw his plea — "frankly that he

was unaware that he could be deported" — was belied by the plea colloquy and

"[t]here's not even an allegation as to who that lawyer was" who gave him the

advice that if he stayed out of jail there would be no immigration

consequences to the plea.  The court further found there was "a plea bargain on

both of these cases," and that "[i]t would be very difficult for the State to bring

forward witnesses at this time on these particular allegations."

Defendant appeals, arguing he established excusable neglect, and

enforcement of the time bar would result in fundamental injustice.  He also

contends he received ineffective assistance of counsel based on the erroneous

advice he received as to the immigration consequences of his plea; plea

counsel's failure to correct the mis-advice; plea counsel's failure to contest the

---

[6]  The four Slater factors are:  "(1) whether the defendant has asserted a
colorable claim of innocence; (2) the nature and strength of defendant's
reasons for withdrawal; (3) the existence of a plea bargain; and (4) whether
withdrawal [will] result in unfair prejudice to the State or unfair advantage to
the accused."  198 N.J. at 157-58.

PTI termination or to attempt to have defendant re-admitted to PTI, and that there exists a presumption of prejudice, "or, at the very least, a reasonable probability" that but for the errors the result of the proceedings would have been different. Finally, defendant contends he "meets the 'manifest injustice' four factor balancing test" to withdraw his guilty plea.

As already noted, we agree defendant established excusable neglect for his failure to file his petition within five years of his January 2013 convictions. Defendant retained Patel shortly after he was placed in ICE custody in December 2014. The immigration lawyer obviously represented defendant zealously in the removal proceedings, successfully securing his release from ICE custody and convincing the government to defer prosecution of his deportation. But Patel also advised defendant, wrongly, that he could end the threat of deportation through naturalization proceedings. It was not until September 2019, after the running of the five-year period for filing a petition, that Patel advised defendant the only way he could remove the threat of deportation was through a PCR proceeding in New Jersey. Upon receipt of that advice, defendant retained his current New Jersey counsel the same month, who filed this action promptly.

Based on those facts, we cannot find defendant slept on his rights. Indeed, we find the circumstances indistinguishable from those the Court

14

deemed excusable neglect in DiFrisco. 187 N.J. at 166 (finding excusable neglect based on "defense counsel's candid statement" that "he did not realize the full effect" of a decision of the Court favorable to the defendant issued during the pendency of the defendant's first PCR proceeding until after review of the defendant's first PCR petition was complete).

Defendant promptly engaged obviously able counsel to assist him in contesting his deportation and ending the threat of his removal. That lawyer concedes his error in not advising defendant earlier that he needed to file a PCR petition in New Jersey. When counsel finally advised defendant he needed to file a PCR petition, defendant acted immediately to do so. Given those circumstances, we find defendant's failure to file his petition within the five-year deadline the result of his excusable neglect. See State v. Milne, 178 N.J. 486, 492 (2004) (noting "[t]he five-year time limit is not absolute").

As to whether defendant established he would suffer a fundamental injustice absent relaxation of the time bar, we are guided by the Court's counsel in State v. Afanador that "[t]he court should consider the extent and cause of the delay, the prejudice to the State, and the importance of the petitioner's claim in determining whether there has been an 'injustice' sufficient to relax the time limits" of Rule 3:22-12. 151 N.J. 41, 52 (1997). We have already discussed the reasons for the delay — defendant was not aware he'd

received faulty immigration advice until his arrest by ICE in 2014, and although he promptly retained immigration counsel following his detention, that lawyer did not advise defendant he needed to file a PCR petition in New Jersey until 2019, when defendant did so promptly. The prejudice to the State is difficult to assess. Defendant concedes his guilt as to the shoplifting charge, so the prejudice to the State is only as to the charge of third-degree receipt of stolen property, which may have been difficult for the State to prove when the charge was made, absent a confession by the thief that defendant was aware the Miata was stolen. The State asserted no specific claim of prejudice, relying on only the significant passage of time, a consideration echoed by the court.

Balanced against that difficult to quantify claim of prejudice to the State, is defendant's claim that he unwittingly pleaded guilty to two crimes of moral turpitude post-Padilla v. Kentucky, 559 U.S. 356 (2010), because his plea counsel failed to advise him of the immigration consequences of the pleas and to correct what he claims was patently incorrect advice that the pleas would have no immigration consequences because he was sentenced to probation with no jail time. Defendant claims that based on that incorrect advice, he spent a year in ICE detention, and faces the threat he can be deported at any time. We conclude that assuming defendant's factual assertions are true —

16

including that he pleaded guilty to receiving stolen property not because he was guilty but because he got erroneous advice about the immigration consequences of risking trial and a jail term — enforcement of the time bar would be fundamentally unjust.[7]  See R. 3:22-12(a)(1)(A).

These were post-Padilla pleas, meaning defendant's plea counsel was obligated to "advise her client regarding the risk of deportation."  Padilla, 559 U.S. at 367.  The Supreme Court in Padilla made clear that "[w]hen the law is not succinct and straightforward . . . a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences."  Id. at 369.  But the Court also held that "when the deportation consequence is truly clear, . . . the duty to give correct advice is equally clear."  Id. at 357.

---

[7]  The State asserts on appeal, as it did in the trial court, that defendant's statement during his first plea colloquy that he "[didn't] have a choice" other than to plead guilty, because he "didn't want to risk going to jail," demonstrates "consciousness of his guilt and his desire to avoid prison time" were his chief motivators in pleading guilty, not avoiding deportation. Defendant contends the statement is consistent with the mis-advice he got that he could not risk going to jail because going to jail risked deportation.  While the State will have the opportunity to convince a court of its view of the statement in an evidentiary hearing, at this stage of the proceedings, "we consider petitioner's contentions indulgently and view the facts asserted by him in the light most favorable to him."  State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999).

Accordingly, it wasn't enough when these pleas were entered for defendant's plea counsel to simply avoid giving defendant incorrect advice, or to avoid giving him any advice as to the deportation consequences of these guilty pleas. See State v. Gaitan, 209 N.J. 339, 356 (2012) (noting the Court in Padilla "recognized no distinction between providing affirmative misadvice and providing no advice, reasoning that to limit the holding to affirmative misadvice would absurdly give counsel 'an incentive to remain silent on matters of great importance, even when answers are readily available'" and "'deny a class of clients least able to represent themselves the most rudimentary advice on deportation even when it is readily available'" (quoting Padilla, 559 U.S. at 370-71)).

Plea counsel was obligated to determine whether there was a clear answer to whether defendant's guilty pleas to third-degree shoplifting and third-degree receipt of stolen property were considered crimes of moral turpitude — because the law was clear at the time of the pleas that a non-citizen convicted of two crimes of moral turpitude "not arising out of a single scheme of criminal misconduct," regardless of whether he went to jail, was deportable, 8 U.S.C. § 1227(a)(2)(A)(ii). See Aburoumi, 464 N.J. Super. at 341 (holding that when the "defendant entered his guilty plea in 2015, the

removal consequence of PTI with an admission of guilt was clear" and thus plea counsel was "required to inform defendant of that consequence").

Defendant's PCR counsel insists that when defendant entered his guilty pleas in November 2012 and January 2013, the immigration consequences of the charges as crimes of moral turpitude were "clear and easily discerned." See State v. Castagna, 187 N.J. 293, 314 (2006) (noting a court is to judge the reasonableness of a lawyer's actions or inactions as of the time of the conduct). Counsel also asserts the advice defendant received from his free telephone consult with an attorney in Atlantic City that he would "be fine" so long as he "stay[ed] out of jail," was obviously, patently, incorrect and plea counsel had an obligation to so advise him.

There is now, of course, no question but that a defendant is entitled to effective assistance in the process of negotiating a plea. Missouri v. Frye, 566 U.S. 134, 144 (2012); Lafler v. Cooper, 566 U.S. 156, 168 (2012) ("If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it."). A claim of ineffective assistance of counsel in connection with a plea is measured by the familiar two-part Strickland[8] standard, with the defendant required to demonstrate counsel's advice was not "'within the range of competence demanded of

[8] Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984).

attorneys in criminal cases.'"  Tollett v. Henderson, 411 U.S. 258, 266 (1973) (quoting McMann v. Richardson, 397 U.S. 759, 771 (1970)).  "[I]n order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  Hill v. Lockhart, 474 U.S. 52, 59 (1985); see also Lee v. United States, 137 S. Ct. 1958, 1968-69 (2017) (holding even a petitioner with little chance of prevailing at trial can establish prejudice from erroneous immigration advice leading to a guilty plea if deportation was the determinative issue for petitioner in plea negotiations).

Although Padilla and Gaitan make clear plea counsel had to avoid both no advice and affirmative mis-advice as to the deportation consequences of the proffered pleas, Gaitan, 209 N.J. at 356, the question of whether plea counsel had an obligation to correct immigration counsel's incorrect advice has not yet been decided in our State, although courts elsewhere have imposed such a duty on plea counsel when the mis-advice was clear.  See, e.g., United States v. Swaby, 855 F.3d 233, 237, 240 (4th Cir. 2017) (holding plea counsel's error in supplying immigration counsel with the incorrect criminal statute and failing to read the statute to confirm immigration counsel's advice, or both, was deficient performance); Madrigal-Estrella v. State, 463 P.3d 23, 27, 30 (Or. Ct. App.) (explaining if the immigration consequences of the defendant's plea

20

were clear and easily ascertainable, then plea counsel was responsible to ensure the defendant received that advice and could not simply assume immigration counsel would provide the defendant correct advice), review denied, 470 P.3d 363 (Or. 2020).

We cannot discern from this record whether defendant is correct that plea counsel could have easily determined with "only very basic legal research" that these pleas would render defendant deportable, and her failure to so advise him was inconsistent with prevailing norms of practice in late 2012 and early 2013. We are convinced, however, defendant has mustered sufficient evidence to establish a prima facie claim of both ineffective assistance of counsel and prejudice — that is, as a result of his counsel's alleged failure to render advice about the deportation consequences of the proffered guilty pleas and to correct the mis-advice he voiced during the second plea colloquy, there is a reasonable probability defendant "'would not have pled guilty and would have insisted on going to trial'" on at least one of those offenses. State v. Nunez-Valdez, 200 N.J. 129, 139 (2009) (quoting DiFrisco, 137 N.J. at 457).

Because plea counsel's understanding of the law and her advice to defendant, if any, about the immigration consequences of his plea lie outside the record, as does proof of the prevailing professional norms of practice when

defendant entered his pleas, an evidentiary hearing is necessary to test defendant's assertions of the ineffective assistance of his counsel and resulting prejudice. See State v. Pyatt, 316 N.J. Super. 46, 51 (App. Div. 1998) (explaining determinations of ineffective assistance claims based on off-the-record conversations between petitioner and his or her counsel "are best made through an evidentiary proceeding with all its explorative benefits, including the truth-revealing power which the opportunity to cross-examine bestows").

The court on remand is also to reconsider defendant's motion to withdraw his plea under the four-part Slater test. As we explained in O'Donnell, although a claim of ineffective assistance of counsel and a motion to withdraw a guilty plea are different applications that must be analyzed separately, "the two tests may overlap." 435 N.J. Super. at 370 (explaining how "[a] defendant may rely on discovery of his or her attorney's misinformation about the consequences of a plea" to establish the reasons for seeking to withdraw the plea under the second Slater factor as well as to establish counsel's representation was not objectively reasonable under the first prong of Strickland). Here, defendant's testimony in support of his ineffective assistance claim may inform the court's assessment of the first two Slater factors — defendant's colorable claim of innocence and the strength of his reasons for wishing to withdraw his plea. The court may also hear

22

evidence to allow it to test the State's claim of prejudice under the fourth <u>Slater</u> factor.

To be clear, we do not suggest by our discussion that defendant has established his plea was not knowing and voluntary under <u>Rule</u> 3:9-2, or that he received less than competent representation or was in any way prejudiced by the representation provided him. We conclude only that he is entitled to relaxation of the time bar under the standard established in <u>Rule</u> 3:22-12(a)(1)(A) and has established the right to present his claims at an evidentiary hearing for the court to consider under <u>Strickland</u> and <u>Slater</u>.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

23